**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND**

**CIVIL ACTION NO. 13-57-DLB-EBA**

**PHILIPPE GEORGEL**                                                                                  **PLAINTIFF**

**vs.**                    **<u>MEMORANDUM OPINION AND ORDER</u>**

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY**                                                         **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**I.     Introduction**

This is a personal injury lawsuit in which Plaintiff Phillippe Georgel seeks to recover damages from Defendant State Farm Mutual Automobile Insurance Company ("State Farm") for injuries he sustained during a motorcycle accident in August 2012. With fact discovery substantially complete, Georgel now moves to exclude the testimony of expert witness Alfred Cipriani, who plans to opine on behalf of State Farm regarding a number of issues, including the cause of the accident. (Doc. # 115). For the reasons discussed below, the Motion to Exclude will be **granted in part** and **denied in part**.

**II.     Factual and Procedural Background**

On August 12, 2012, Georgel and three companions were riding their motorcycles near the city of Louisa, in Lawrence County, Kentucky. (Doc. # 116 at 2-3). The riders were traveling south on U.S. 23 when they arrived at the intersection of Kentucky State Route 32. (Doc. # 116-4 at 3). As the group prepared to turn right, a Chevrolet pickup

truck approached from the east. (*See id.*) While his companions turned ahead of the oncoming truck, Georgel waited for the truck to pass and then made his turn. (*Id.*) The truck, now in between Georgel and his fellow riders, belonged to former defendant Waynwright Preece. (Doc. # 116 at 2).

Route 32 has one lane for each direction of traffic, which are separated by double yellow dividing lines. (Doc. # 116-7 at 15). After turning, Georgel was traveling in the westbound lane directly behind Preece. (*Id.*) He continued on this path for approximately 15 seconds when Preece began to slow his truck and pull over to the shoulder of the road.[1] (*Id.*) Based on the truck's position and speed, Georgel assumed that Preece was allowing him the opportunity to pass, so he accelerated his motorcycle while staying in the westbound lane. (Doc. # 116-1 at 4). However, before he could overtake the truck, it began to turn left towards Willow Drive, a road that intersects with Route 32 from the south. (*Id.*) Due to the proximity of the vehicles when Preece began his turn, Georgel was forced to brake hard and "lay his bike down" in order to avoid a collision. (*Id.*) He slid for approximately 80 feet and came to rest in a nearby field. (Doc. # 116-7 at 16). Georgel did not cross the double yellow dividing lines until after his bike went down, and though he incurred significant injuries during the slide, he never made contact with Preece's truck. (*See* Doc. # 116-2 at 4).

---

[1] Georgel testified that "if [the truck] was not a complete stop, that [it] was very, very close to a complete stop." (Doc. # 116-1 at 4). He added that "[t]he [truck] is not at all on the lane; the [truck] is on the side." (*Id.*) Cipriani emphasizes that Georgel also gave testimony suggesting that Preece's truck might have been partially within the road, as opposed to completely on the shoulder. However, Georgel's Motion resolves any doubt as to where he believed Preece's truck was located when he attempted the pass. "[T]he Preece vehicle was completely off the traveled portion of Route 32 and Plaintiff's lane of travel was clear." (Doc. # 116 at 2).

2

Preece recalls the incident differently in certain key respects. While he admits to gradually slowing his truck, he states that he did so only to prepare for a left-hand turn onto Willow Drive, not because he intended to allow Georgel to pass him from behind. (*Id.* at 4-5). Moreover, he insists that his truck was completely within the westbound lane when he started the turn and did not enter the shoulder lane at any point before then. (*Id.*; *see also* Doc. # 116-3 at 2). Preece concedes that his turn signals were not operational, and that some of his break lights were not working, yet he contends that the accident was caused by Georgel's high rate of speed and failure to maintain a proper lookout. (Doc. # 116-3 at 2-3).

Two of Georgel's companions gave depositions regarding the events of August 12, 2012. (Docs. # 116-4 and 116-5). Relevant here is their testimony vis-a-vis the position of Preece's truck immediately before the accident. Chris Ferguson, who at the time was driving ahead of Preece, stated that "[Preece] had pulled off to the right side of the road and I seen the truck stopped on the right side of the road." (Doc. # 116-4 at 3). Also positioned in front of Preece, Chris Gibson similarly recalled that he "saw the pickup pull off to the right of the road and stop . . . . I'm thinking well he pulled over to let Philippe go by him because he knew he was with us. " (Doc. # 116-5 at 4).

Local law enforcement officer Deputy Chuck Jackson responded to the scene and later prepared an accident report. Deputy Jackson was questioned regarding the contents of his report during a November 3, 2014 deposition, which revealed the following:

Q: All right. I've gone through the report, and I don't' see anything noted, but what physical evidence, if anything was there at the scene?

A: There was none.

> Q:   None? Okay.
>
> A:   It was--my report was complied on what both parties had told me. There was no physical evidence to indicate that Mr. Preece was on the right or that Mr. Preece was on the left or if Georgel was speeding or was not speeding. There was nothing there for me to observe.
>
> Q:   And just so the record is clear, when we say "physical evidence," let me just ask you, there weren't any skid marks, correct?
>
> A:   I did not see any skid marks, no gouge marks, no debris, no yaw marks. None of that was observed.

(Doc. # 116-6 at 3-4).

Georgel filed his complaint on May 2, 2013, alleging Preece was at fault and seeking damages for injuries he sustained as a result of the accident. (Doc. # 1 at 2-4, ¶ 8-13). Having learned that Preece was underinsured, Georgel also named State Farm as a defendant because his motorcycle is covered by a State Farm policy which includes benefits for damages caused by underinsured motorists. (*Id.*) Preece was dismissed from the case by agreed order on February 6, 2014, at which point Georgel chose to proceed against State Farm on all claims asserted. (Docs. # 57 and 58). Since then, the parties have taken considerable discovery.

In the event this matter goes to trial, State Farm intends to call Alfred Cipriani as an expert witness. Cipriani, an engineer and certified traffic accident reconstructionist, will opine on a variety of issues, including the ultimate cause of the accident. (*See* Doc. # 116-7). He has prepared a written report explaining his opinions in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). (Doc. # 116-7). He was deposed on October 8, 2014. (Doc. # 116-8).

4

In his Motion to Exclude, Georgel contends that Cipriani's testimony should be excluded pursuant to Rule 702 of the Federal Rules of Evidence. (Doc. # 116). State Farm responded on December 2, 2014, and Georgel replied in turn. (Docs. # 120 and 123). Neither party has requested a *Daubert* hearing, and the Court has decided that one is not necessary. Accordingly, the Motion to Exclude is ripe for review.

### III. Analysis

#### A. Rule 702

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, expert testimony is admissible under Rule 702 if (1) the expert is qualified and the testimony is reliable, and (2) the evidence is relevant and helpful to the jury. *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 673 (E.D. Ky. 2010) (citing *United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997)). The decision to admit or exclude expert testimony "ultimately lies in a fact-intensive analysis that is particular to each circumstance and subject to the discretion of the trial court." *Scott*, 714 F. Supp. 2d at 673 (citing *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-51 (1999)). The proponent of the testimony

bears the burden of establishing admissibility, which must be shown by a preponderance of the evidence. *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

### 1. Reliability[2]

Rule 702 provides a general framework for assessing the reliability of expert testimony. A district court should ask whether the proffered testimony is "based on sufficient facts or data," whether it "is the product of reliable principles and methods," and whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The focus, then, is on the validity of the principles and methodology, "not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). An expert seeking to offer his opinion in the courtroom must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In *Daubert*, the Supreme Court identified four factors to assist district judges in making a reliability determination. These factors include (1) whether the expert's method can be tested, (2) whether it is widely published or has been subjected to peer review, (3) whether it has "a known or potential rate of error," and (4) whether it is generally accepted in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94. Because the test for reliability is a "flexible one," the *Daubert* factors are not regarded as a "definitive checklist." *Id.* To the contrary, they should be tailored to each case as necessary, *see id.*, or

---

[2] Having reviewed Cipriani's background and experience, as detailed in pages 1 through 4 of the expert report, the Court find that he is qualified to offer expert testimony in the field of accident reconstruction. (*See* Doc. # 116-7). Georgel openly concedes this point. (Doc. # 116 at 3, n.1). Therefore, the only issue to address under the first prong of Rule 702 is reliability.

disregarded completely if "they are [not] reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001).

While *Daubert* involved *scientific* testimony, Rule 702 also contemplates expert opinions that are based on "technical [or] other specialized knowledge." Fed. R. Evid. 702. When expert testimony is nonscientific, "experience alone--or experience in conjunction with other knowledge, skill, training or education" can be sufficient to establish reliability. *Id.* (see advisory committee notes); *see also Kumho Tire Co., Ltd.*, 526 U.S. at 150 (noting with regard to nonscientific experts that "the relevant reliability concerns may focus upon personal knowledge or experience"). However, where a witness relies primarily on experience as the foundation for her testimony, "the witness must explain how that experience leads to the conclusion reached, why that experience is sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 (see advisory committee notes). If such explanations are lacking, "[a] district court is not required to admit expert testimony 'that is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson*, 243 F.3d at 254 (quoting *General Electric. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Regardless of how a district court gauges an expert's reliability, the baseline inquiry is always whether the proffered testimony is "supported by appropriate validation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). Ultimately, a judge's task is to verify that the expert's theory or technique "works":

> The foundation must include a showing of the results when the technique was used on prior occasions . . . [n]either the expert's voucher nor general acceptance in the field nor even long term, repeated use of the theory

7

> suffices . . . It is also clear that it is not enough for the witness to assert in conclusory fashion that she is relying on her general 'expertise,' 'knowledge,' or 'education.' Those considerations can qualify the witness as an expert, but they do not speak to the validity of the expert's theory or technique. To provide a useful expert insight, the witness must identify a more specific technique or theory. The witness must articulate that technique or theory. Otherwise, the witness is venturing nothing more than a guess.

1 McCormick on Evidence, § 13 (7th ed. 1999).

Finally, the Sixth Circuit has held that district courts should be particularly skeptical of expert testimony when the following "red flags" are present: "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). "In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." *Id.*

####     2.    Relevance

The other factor to consider under Rule 702 is relevance, which simply means the expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In order to properly assist the jury, however, the opinion must concern matters that are "beyond the understanding of the average lay person." *Seiber v. Estate of McRae*, Case No. 11-CV-00111, 2013 WL 5673601, at *6 (W.D. Ky. Oct. 17, 2013) (citing *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (internal quotations omitted)). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id.

### B. Cipriani's Report

Cipriani's expert report contains the following six opinions:

1) There was no contact between the Chevrolet and the Kawasaki;

2) Mr. Georgel attempted to pass the Chevrolet in a "no passing" zone;

3) The turn signals and brake lights on the Chevrolet were not operational;

4) Mr. Georgel lost control of his Kawasaki as he attempted to pass the Chevrolet while crossing the double yellow centerline;

5) Mr. Georgel was traveling at approximately 30-41 mph when he lost control of his Kawasaki; and

6) Mr. Georgel's accident was caused by his failure to maintain control of his Kawasaki while attempting to pass the Chevrolet in a "no passing" zone of the road.

(Doc. # 116-7).

According to the report, Cipriani conducted three procedures to arrive at these opinions. (*Id.* at 9). First, he reviewed the materials within the accident file, including the police report, the parties' recorded statements, transcripts from five depositions, photographs of the scene (taken two months after the accident), photographs of the motorcycle, a repair estimate for the motorcycle, and Georgel's interrogatories and answers. (*Id.*) Second, he researched the dimensions and specifications of each vehicle. (*Id.*) Finally, he explored the area surrounding the accident using street views and aerial photographs from Google. (*Id.*) Cipriani testified that he never actually visited the scene because the accident itself produced no useful physical evidence, such as gouge marks or skid marks. (Doc. # 116-8 at 7).

In the analysis section of the report, Cipriani elaborates on his opinions in varying degrees. (Doc. # 116-7 at 15-17). Opinions 1 and 3, which consist primarily of

uncontested facts, are discussed quite briefly. (*Id.* at 16). Opinion 2 is more involved, however, as it required Cipriani to establish the position of Preece's truck when it started to turn left; i.e., whether it was partially within the westbound lane, or clear of the main road and completely onto the shoulder. (*Id.*) After reviewing the "differing accounts presented in statements and depositions," Cipriani decided that the truck was still in the westbound lane, at least to some degree. (*Id.*) This, along with the fact that Route 32's driving lanes are separated by a double yellow dividing line, led to the conclusion that "Mr. Georgel attempted to pass the Chevrolet in a 'no passing' zone." (*Id.*)

Opinion 4 also rests on a number of predicate findings. Because Preece's intentions were unclear as he approached Willow Drive, Cipriani initially determined that Georgel was "incorrect" in assuming that Preece was allowing him the opportunity to pass. (*Id.*) He then explained that Georgel's decision to "accelerate and attempt to pass . . . contributed to [his] inability to slow sufficiently or to maintain control of the Kawasaki." (*Id.*) He further declared that Georgel would have avoided the collision "[h]ad he not accelerated for an attempted pass." (*Id.*) These findings directed the opinion that "Mr. Georgel lost control of his Kawasaki as he attempted to pass the Chevrolet while crossing the double yellow line." (*Id.* at 17).[3]

---

[3] Cipriani conceded that Opinion 4 is "inartfully phrased." (Doc. # 116-8 at 13). He acknowledged that Georgel did not attempt to pass by crossing over the double yellow dividing lines, but rather started the pass within his own lane of travel and crossed over the yellow lines only after Preece began to turn left, in order to avoid a collision. (*Id.*) To this point, Cipriani explained:

> So the initial effort of Mr. Georgel was to pass in a no passing zone in the westbound lane. And then because of the movement of the pickup truck, whether he did or didn't take that left, Mr. Georgel then reacted to that and steered further to the left going over the double yellow line, probably going down at that point and sliding down to his final rest position. But the original pass was in the [westbound] lane.

Opinion 5 required Cipriani to conduct "a speed analysis for the Kawasaki based on the approximate final rest position, the sliding distance range given by Mr. Preece, and using a frictional drag coefficient of 0.5 to 0.7." (*Id.*) In doing so, he determined that "Mr. Georgel was traveling between 30 and 41 mph when he lost control of his Kawasaki." (*Id.*) Finally, Opinion 6 consists of a single statement, and is precisely what it claims to be. "In summary, Mr. Georgel's accident was caused by his failure to maintain control of his Kawasaki while attempt to pass the Chevrolet in a 'no passing' zone of the road." (*Id.*)

During his October 8, 2014 deposition, Cipriani was pressed further regarding the manner in which he formulated his opinions. Many of the exchanges prove quite relevant in determining admissibility under Rule 702. With respect to Opinion 2, for instance, Georgel's attorney asked Cipriani what "principles of traffic accident reconstruction" he used to establish that Georgel attempted to pass in a no passing zone. (Doc. # 116-8 at 12). Cipriani replied:

> Oh, that's too easy. It's a two lane road with a double yellow line. That means no passing . . . . Now . . . if the truck is completely off the road so that there is a completely clear lane, well, then he's not passing anybody that's in the road. But all the testimony indicates that that pickup truck is still in the road with most of the vehicle in the road.

(*Id.*) Regarding the truck's position, Georgel's attorney inquired, "So you're relying upon the subjective statements of the witnesses and the parties?", to which Cipriani responded, "Essentially, yes." (*Id.* at 13). Clarifying further, the attorney asked, "And you are determining what weight to give those statements and testimony, correct?" (*Id.*) Cipriani answered:

---

(*Id.*)

11

> To some degree that would be true. But again, we have a *concurrence* shall we say of the testimony first of the involved parties, even though they were friends of Mr. Georgel's, as to how far the Chevrolet was off the road or not off the road . . . . Again, you know, it would appear from all the testimony . . . that Mr. Preece was 1 to 2 feet over the white line with his car.[4]

(*Id.* at 13-14). (emphasis added).

Georgel's attorney then asked how Cipriani's education, training or experience made him more qualified than a judge or jury to evaluate the witnesses' testimony. (*Id.* at 14). Evading the issue at first, Cipriani replied that "[a]n educated accident reconstructionist would get to the same result, let's just put it that way." (*Id.*) The attorney restated his question, and Cipriani answered, "Engineering training, vehicle accident reconstruction for the last 34 years, appreciation for what people do out on the road. I think it makes . . . a significant difference on being able to read these various depositions and statements and evaluate what they're saying than the average individual." (*Id.*) Cipriani later offered a more pedestrian explanation for the weight he afforded each witness's testimony. (*Id.* at 15). He reasoned that Georgel and Preece were potentially biased due to their direct involvement in the accident, and discounted their statements as a result. (*Id.*) However, he deemed the other riders "independent," and thus gave more credence to their description of the accident, particularly with respect to where the truck was located. (*Id.*)

---

[4] Despite some inconsistencies in his testimony, Georgel's position continues to be that Preece's truck was entirely off the road when it began to turn left onto Willow Drive. *See supra* note 1. Georgel's companions, Ferguson and Gibson, have provided similar accounts, (Doc. # 116-4 at 3; Doc. # 116-5 at 4), although according to Cipriani, they have also made statements suggesting that the truck was only 1 to 2 feet off the side of the road. (Doc. # 116-8 at 13). Presumably, these statements are contained in the full deposition transcripts, which have not been filed with the Court. Finally, Preece's position is and always has been that he never entered the shoulder lane prior to turning. (Doc. # 116-3 at 2). While Cipriani contends that there is a "concurrence" among the various parties' accounts, obviously he was required to resolve these testimonial discrepancies in rendering his opinion.

The exchange eventually turned to Opinion 6, at which point Georgel's attorney asked how Opinion 6 was any different from Opinions 2 or 4. (*Id.* at 16). Cipriani explained, "It's a summary conclusion I guess is the best way to put it. But yes, number two and number four are part of that." (*Id.*) State Farm then began its examination, asking first if it is typical to have a case involving no physical evidence at the scene of the accident. (*Id.* at 16-17). Cipriani estimated that it occurred roughly 25 percent of the time. (*Id.*) State Farm also inquired, "In your 34 years of accident reconstruction and engineering experience, how often do you have a case where you don't look at any witness statements whatsoever?" (*Id.* at 17-18). Cipriani confirmed that he relies on witness statements for every accident he reviews. (*Id.* at 18).

### C. Except for Opinion 5, Cipriani's Testimony will be Excluded

#### 1. Opinions 2, 4 and 6 are unreliable and irrelevant

In this case, the issue of liability will depend largely upon whose side of the story the jury believes. If Preece, after pulling his truck completely off the road, suddenly turned left from the shoulder lane without using a turn signal, the jury could certainly find that he caused the accident along with Georgel's injuries. If, on the other hand, Preece remained in his lane and was simply slowing down to turn left onto Willow Drive, then, despite the fact that his truck lacked properly functioning turn signals and break lights, the jury could reasonably conclude that Georgel is to blame, as he attempted to pass in a lane that was already occupied and designated a no passing zone.

Opinions 2, 4 and 6 are designed to persuade the jury that the latter scenario is what actually occurred. In other words, they will be offered to show that Georgel was the cause of the accident. However, in order to be admissible under Rule 702, the opinions must be

reliable and relevant. *Daubert*, 509 U.S. at 589. The Court will address each criterion in turn.

        i        <u>Reliability</u>

Cipriani's position regarding the cause of the accident is not based on anything resembling a scientific principle or method. Rather, he admits that due to the complete lack of physical and objective evidence, he relied primarily on the subjective statements of parties and witnesses, particularly in concluding that Preece's truck remained partially within the westbound lane. When asked what about his qualifications enabled him to expertly weigh those statements, he cited his engineering training and 34 years of accident reconstruction experience. While an expert may rely on experience to establish reliability, he must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 (see advisory committee notes). Because Cipriani did none of these things, the Court is left with only his *ipse dixit* to connect the proffered testimony with the facts of this case.

Nonetheless, State Farm contends that Cipriani's testimony is sufficiently reliable. In support of this contention, it recites the various procedures from Cipriani's expert report, emphasizing that he "utilized the same time-tested accident reconstruction and analysis techniques that he uses in every case to arrive at his opinions." (Doc. # 120 at 8). Similarly, State Farm observes that Cipriani's reliance on the witness statements "was the same" as in any case he reviews. (*Id.*) However, simply because an expert utilizes the same procedures he employed in other cases does not establish that his testimony is reliable. While such factors may "qualify the witness as an expert . . . they do not speak

14

to the validity of the expert's theory or technique." 1 McCormick on Evidence, § 13 (7th ed. 1999). Indeed, when it comes to establishing reliability, "[n]either the expert's voucher nor general acceptance in the field *nor even long term, repeated use of the theory* suffices." *Id.* (emphasis added).

State Farm also relies on *Clay v. Ford Motor Company*, 215 F.3d 663 (6th Cir. 2000). There, two passengers in a Ford Bronco were killed when the car's driver lost control on the interstate. *Id.* at 666. The passenger's parents brought suit against Ford, claiming the Bronco was defectively designed, and retained an expert to explain how the alleged defects caused the accident. *Id.* at 667. In doing so, the expert reviewed the police report and the parties' statements and testimony, and applied principles in engineering and "dynamics," which he defined as the "analysis of the forces that produce motion in objects." *Id.* at 668. He explained how he calculated the Bronco's stability index and why he believed it was too low. *Id.* He then opined that "Slonsky's statement that the vehicle 'overcompensated' during the double lane change was consistent with the Bronco II's tendency to oversteer." *Id.*

On appeal, the district court's decision to admit the testimony was affirmed. *Id.* at 675. The Sixth Circuit, while acknowledging Ford's criticism that the expert relied heavily on the accident report and the parties' statements and depositions, emphasized that Ford had failed to challenge "the principle that dynamics can be used to analyze vehicle designs and predict their motion." *Id.* at 668. This point illustrates the crucial difference between *Clay* and the case at hand. Though Cipriani relied on similar evidence to form the basis for his opinions, he never connected the two with a legitimate theory or method. Therefore, State Farm's reliance on *Clay* is misplaced.

In summary, Opinions 2, 4 and 6 do not constitute reliable expert testimony. They are not "supported by appropriate validation," but rather are based almost exclusively on the parties' statements and testimony, which are highly subjective. The Court recognizes that Cipriani weighed these statements in light of his experience in the field, but without explaining why that experience provides a sufficient basis for his opinions, such efforts do not satisfy the required standard under *Daubert* and Rule 702. Simply put, there is still "too great an analytical gap between the data and the opinion proffered." *Nelson*, 243 F.3d at 254 (citing *General Electric*, 522 U.S. at 146).

ii. <u>Relevance</u>

Even if Opinions 2, 4 and 6 were reliable, they would still be excluded. Expert testimony must also be relevant, meaning it will help the jury to understand the evidence or determine a fact in issue. Fed. R. Evid. 702. The cornerstone of Cipriani's position is that Preece's truck was still partially within the westbound lane when it began to turn left. Again, because there was no physical evidence at the accident scene, he admits that he arrived at this conclusion by weighing the parties' statements and testimony. In particular, he considered the witnesses' relationship to Georgel as well as the parties' direct involvement in the accident. (Doc. # 116-8 at 15). Such measures, though critical when assessing a witness's credibility, are not beyond the understanding of an average layperson.[5] In fact, assessing a witness's credibility is what juries do in every trial.

---

[5] State Farm suggests that Cipriani's credibility determinations are just another part of the "engineering and accident reconstruction analysis." (Doc. # 120 at 4). However, the Court finds this argument disingenuous. It is well-settled that "witness credibility is a jury function." *Burley v. Gagacki*, 729 F.3d 610, 621 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

16

Cipriani's testimony is really nothing more than the jury should believe Mr. Preece's version of events over Plaintiff's. If Cipriani is not allowed to testify, State Farm is perfectly capable of communicating this same point during opening and closing statements. Because testimony of this nature does not "assist the trier of fact," it is not relevant under Rule 702. *See Seiber v. Estate of McRae*, No. 1:11-CV-00111-TBR, 2013 WL 5673601, at *6 (W.D. Ky. Oct. 17, 2013) (holding that a jury, when faced with two conflicting accounts, "does not require specialized knowledge to determine the more reliable account.").

Finally, the parties acknowledge that Opinions 2, 4 and 6 also pertain to the applicable standard of care. In effect, Cipriani has opined that Georgel acted negligently by attempting to pass in an occupied lane that was also designated a no passing zone. Again, this opinion is highly irrelevant. The jury does not require technical or specialized knowledge to ascertain whether or not Georgel breached his standard of care. On these facts, the issue is a matter of common sense, or, as the parties suggest, governed by state traffic laws. Cipriani's testimony does not assist in either area.[6] Thus, to the extent Opinions 2, 4 and 6 bear on the applicable standard of care, they are excluded as irrelevant. *See Smithfield Packing Co. v. Armstrong Indus. Refrigeration & Maint. Serv.*, No. 11-282, 2013 WL 757210, at *4 (E.D. Ky. Feb. 27, 2013) ("[W]here the standard of care is within the general or common knowledge of laypersons, an expert witness is not necessary to establish the standard.").

---

[6] Cipriani admits that he did not consult any state traffic laws in concluding that it was improper for Georgel to attempt a pass in a no passing zone. Even if he had, Cipriani does not contend to be an expert in interpreting traffic statutes. (Doc. # 116-8 at 15).

### 2. Opinions 1 and 3 are also excluded

The parties agree that there was no contact between Georgel's motorcycle and Preece's truck. Because the jury needs no help in establishing this fact, Opinion 1 is patently irrelevant. Similarly, the parties agree that Preece's turn signal was not operational. They also agree that the break lights were not working properly, except that Georgel asserts none of them functioned, while Preece maintains that the brake light above the cab still worked. Cipriani does not attempt to resolve this dispute, nor does he establish or refute any of these facts through engineering principles or accident reconstruction. Instead, he simply recites what the parties and witnesses have already said. This the jury can do without. Therefore, Opinion 3 is also irrelevant.

### 3. Opinion 5 is admissible

To arrive at Opinion 5, Cipriani conducted "a speed analysis for the Kawasaki based on the approximate final rest position, the sliding distance range given by Mr. Preece, and using a frictional drag coefficient of 0.5 to 0.7." (Doc. # 116-7 at 17). Without claiming to understand the ins and outs of this calculation, the Court is confident that Cipriani is applying engineering and/or accident reconstruction principles that the average lay person would not be familiar with. The principles appear to be valid, properly applied and squarely within Cipriani's area of expertise.[7] Because Opinion 5 is both reliable and relevant, it is admissible pursuant to *Daubert* and Rule 702.

---

[7] For instance, when discussing this calculation during the deposition, Cipriani explained that if Georgel's sliding distance was lower or higher, the estimate speed would change correspondingly. (Doc. #116-8 at 14).

IV.  **Conclusion**

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)  Georgel's Motion to Exclude (Doc. # 115) be, and is, hereby **GRANTED IN PART** and **DENIED IN PART**;

(2)  The Motion is **granted** to the extent it seeks to exclude Opinions 1, 2, 3, 4 and 6; and

(3)  The Motion is **denied** to the extent it seeks to exclude Opinion 5.

This 6th day of August, 2015.



Signed By:
*David L. Bunning*  DB
United States District Judge

G:\DATA\Opinions\Ashland\13-57 Granting Motion to Exclude.wpd